Robert F. HANCOCK, Appellant,

v.

The STATE of Texas, Appellee.

No. 39526.

Court of Criminal Appeals of Texas.

April 20, 1966.

Rehearing Denied June 1, 1966.

Frank R. Jewell, Dallas, for appellant.

Henry Wade, Dist. Atty., James H. Miller, James B. Zimmermann and Malcolm Dade, Asst. Dist. Attys., Dallas, and Leon B. Douglas, State's Atty., Austin, for the State.

BELCHER, Commissioner.

The conviction is for felony theft; the punishment, five years.

The indictment alleged the theft of fifty-nine documents in writing which were computer programs, and that they were taken on or about November 10, 1964, from the possession of Dan Wilkins. The programs were not set out in the indictment but each was sufficiently described for identification.

The appellant, an employee of Texas Instruments Automatic Computer, a corporation (hereinafter referred to as TI), and William Bennett Smith III, an employee of an insurance company, first became acquainted with each other in May, 1964, and on September 1, 1964, began sharing together an apartment in Dallas. The appellant told Smith his job was classified and for security reasons he could not talk about it, but soon they began discussing computers, computer programs, and the value of computers, as the appellant had been a computer operator and was then engaged in writing and re-writing computer programs and was in possession of computer programs; and he told Smith they would be of great value to Texaco, one of TI's clients. Upon appellant's suggestion and offer to finance, Smith agreed to go to Houston and approach Texaco about the purchase of the programs. After a meeting was arranged by telephone with Texaco in Houston for October 16, the appellant gave Smith an index listing all the programs he had and also gave him one program to verify the authenticity of those listed in the index. The appellant gave Smith his walking cane to carry for protection if Texaco tried to take the index and programs from him. After a meeting with two representatives of Texaco, Smith returned to Dallas and told the appellant that the representatives after examining the material, which they said was very valuable, stated that they could not enter into any confidential negotiations. To this report the appellant became very upset, but when nothing developed during the next few days the appellant asked Smith to again contact Texaco, which he did. In a short time, Don Sims, purportedly of Texaco, told Smith by telephone while appellant listened on an extension, that they were interested in the programs, and if Smith would bring them to Houston they would examine them and be in position to begin discussions on the price, and they agreed to meet November 11.

The appellant gave Smith the programs, took him to the airport, and Smith made the contact in Houston with a man using the name of Don Sims, who said he was in the computer department. Smith showed Sims the index and a program, then Sims asked for the other programs and Sims' companion examined each of them. When Sims asked for a price, Smith, believing he was an agent of Texaco, offered to sell the programs for five million dollars. At this time Sims took possession of all the material Smith had and then revealed that his name was Dale Simpson, an investigator, and told Smith he would meet him at a nearby office. Smith immediately telephoned the appellant saying, "We are in a heck of a lot of trouble," and the appellant replied, "Yes, I know it," and Smith returned to Dallas.

Dan Wilkins testified that he was the manager of the Dallas Computer Center of Texas Instruments; that he knew the appellant, who began working at TI as a computer operator and later began writing and rewriting computer programs; and that the

programs shown him by Dale Simpson were the same listed in the indictment. It was stipulated that Dan Wilkins had read the indictment in this case, and that the items listed in the indictment were his corporeal personal property and in his care, control, and custody as a manager of TI, and he did not, for those programs listed in the indictment, give permission to remove them from the premises.

Testimony was introduced that each of the programs listed in the indictment had a reasonable market value of more than fifty dollars; that all the programs listed in the indictment had a reasonable market value of approximately two and one-half million dollars; and that the appellant did not have consent to take and appropriate said programs to his own use and benefit.

Testifying in his own behalf, the appellant admitted his employment at TI and that he had been engaged in writing and re-writing computer programs at the time here in question, and that all of the programs listed in the indictment were included in his assignment; that TI wanted to complete the program production schedule as soon as possible, and for appellant to comply with the plan of speedy production he would have to take this material to his apartment and work on it both at home and the office, and Wilkins consented to this work plan; that he began working on the programs at home immediately and continued until he left TI, and during this period he had at home at least 75 or 100 copies of programs. During this time Smith was present when he worked on programs at home and was aware of and showed interest in the programs. Appellant further testified that the first time he knew he was charged with improperly taking the programs from TI was on November 11, when he was told by a security officer at TI that Smith at that moment was in Houston offering a large number of programs for sale to Texaco, and it appeared he had furnished these programs to Smith; that he was then placed on suspension and it was so emphatic it scared him and he insisted on advising with an attorney; that when he arrived at the apartment Smith called from Houston saying he was in trouble, and appellant asked him what it was about and Smith replied that he would tell him when he got home; that he never gave Smith any programs or directed him to sell any; that he had missed the programs in question but thought he had misplaced them.

It is contended that the computer programs alleged to have been stolen do not constitute corporeal personal property and were not the subject of theft.

Title 17, Chapter 8 of the Penal Code, entitled Theft In General, in Art. 1418, Vernon's Ann.P.C., defines "property" in part as follows:

"The term 'property', as used in relation to the crime of theft, includes * * * *all writings of every description, provided such property possesses any ascertainable value.*"

■ It is evident that the computer programs as alleged and the evidence in support thereof show that such property is included and comes within the meaning of the provisions of the statutes defining the offense of theft.

■ Appellant contends that the trial court erred in permitting the state to prove the contents of the documents as charged in the indictment by oral testimony over his objection that the documents themselves were the best evidence and should be introduced in evidence.

The indictment is in the ordinary form for charging felony theft. None of the computer programs was set out in the indictment, but each of them was sufficiently described for identification. No complaint was made at the trial or on appeal to the sufficiency of the indictment. The computer programs were produced and available during the trial but were not introduced in evidence. Their introduction into evidence in light of the pleadings and the evidence was not required. Fulshear v. State,

59 Tex.Cr.R. 376, 128 S.W. 134; 55 Tex. Jur. (2) 465, Sec. 202. However, it is pointed out that the state offered the programs several times during the trial to the appellant and his attorney for examination but they never availed themselves of the offer. The programs were also made available to the jury, but for security reasons the state requested that they not be formally introduced in evidence, which request the trial court granted. The testimony of the appellant reveals that he was familiar with each of the computer programs described in the indictment.

It is contended that the testimony of the witness Smith pertaining to the computer programs was not admissible on the ground that they were illegally obtained by the state.

Dale Simpson, an investigator employed by Texas Instruments and Texaco, testified that after determining that Smith had exhibited and offered for sale computer programs to representatives of Texaco which belonged to TI, he contacted Smith in Houston on November 11; that at the meeting Smith exhibited to Simpson and his companion the computer programs which they examined, and then he (Simpson) identified himself, took possession of the computer programs which are the programs involved herein, and left, taking them to Dallas.

From the facts it is evident that Simpson had reasonable grounds to suppose and believe that the computer programs were stolen, and under Art. 325, Vernon's Ann.C.C.P., he had the right to prevent the consequences of theft by taking possession of the programs and delivering them to a peace officer. The programs were legally obtained and were admissible in evidence. Lasker v. State, 163 Tex.Cr.R. 337, 290 S.W.2d 901.

It is insisted that there is no evidence showing the market value of the computer programs in Dallas County.

Robert C. Dunlap, Jr., testified that he had degrees in science and geology and had done graduate work in geophysics and geology at Harvard; that he was vice-president of Texas Instruments and had been employed by them thirty-two years; and that he was president of Geophysical Services, Incorporated. He further testified as follows:

"Q How long have you been associated with the, and connected with the computer aspect of the business?

"A Since it began (ten years ago).

\*　　\*　　\*　　\*　　\*　　\*

"Q All right, sir. I'll ask you if you are familiar with the computer programs that are listed in that Indictment?

"A Yes, sir.

"Q Are those computer programs that are listed in that Indictment, are they computer programs of Texas Instruments?

"A Yes, sir.

"Q Now, are there what I would think of as competitors in that field, that is, seismic programs as competitors?

"A Yes, sir. I think we were the first to introduce this type of technology. Other people are working in the area now.

"Q Now, let me ask you this: In the past, have companies or competitors or whatever you want to call it, have they made requests of your organization seeking perhaps to purchase programs from you?

"A. Yes, sir.

"Q Would those include the packages or the lists of programs included in the Indictment?

"A Yes, they do.

Appellant's Attorney: Excuse me, Your Honor, I object to that as hearsay.

The Court: Overruled.

"Q Assuming that Texas Instruments, the Science Services Division, assuming that the programs listed in the indictment were going to be sold, what person in the whole Texas Instruments organization would be the one to decide, first of all, what value we ask for?

"A I would be the one.

"Q Now, in relation to these computer programs and the seismic computer programs, is there a market for these—by that, I mean if you were willing to sell them to a willing buyer a willing buyer under no compulsion to buy, I have to state that to you because that's the way the law says it, could you find a buyer— Do you understand my question?

"A I do, and certainly there is a market.

"Q Now, in regards to this Indictment, sir, I'll ask you if each of those programs in that Indictment, thinking about each one of them separately, yet from the standpoint of you as a willing seller under no compulsion to sell and a willing buyer under no compulsion to buy, in order to arrive at a reasonable market value of each one of those programs there separately, a reasonable market value for each one of those, would it be more than $50.00?

"A Yes, sir.

"Q Now, in relation to the entire computer programs, the entire package listed in that Indictment, can you give me any opinion, your own opinion, based upon your knowledge of the business and circumstances— can you give me any opinion what the reasonable market value of all of those programs would be?

"A Yes, sir.

"Q What would that be?

"A A minimum figure would be approximately two and a half million dollars.

"Q Now, is that being conservative?

"A Yes, sir."

On cross-examination Dunlap testified:

"Q Now, you say that there is a market for these programs here in Dallas County?

"A I said there's a market. I am sure there's one in Dallas County.

\* \* \* \* \* \*

"Q These programs, Mr. Dunlap, were developed by the employees of Texas Instruments, right?

"A That is right.

"Q They are for use only by the personnel of Texas Instruments?

"A That's right.

"Q You maintain a degree of secrecy and security concerning these?

"A Yes, sir.

"Q And the fact that these programs, insofar as we know, the fact that these programs are superior to any other programs, that gives you an economic advantage over other competitors?

"A Well, that's our opinion.

"Q Are the contents of these programs known only to the people within the Texas Instruments company?

"A Yes, sir.

\* \* \* \* \* \*

"Q And at times a great deal of money and effort is expended in the development of a program?

"A That's right.

"Q Now, these particular programs listed in this Indictment, insofar as you know, are they unique within this particular field of geophysical use with computers?

"A Insofar as we know."

Dan Wilkins, manager of the computer center for Texas Instruments, testified in part as follows:

"Q Do they (computer programs) have anything to do with operations that Texaco is interested in?

"A Well, yes, Texaco have purchased from us two of our TIAC computers and they are in the process of trying to find oil with them.

"Q Of the programs that you read in the Indictment, would Texaco have any more interest in those programs than they would in any other programs that you all have out there?

"A Well, at that time, these were—you might say our hottest thing going— they were what we were selling as service with or to Texaco based on the use of these programs.

"Q These are programs listed in the Indictment?

"A Yes, sir."

This evidence was sufficient to authorize a finding that the computer programs as alleged had a market value in excess of fifty dollars each.

The refusal of the trial court to require the state to elect the count upon which it sought a conviction is urged as ground for reversal.

The indictment alleges only one count which includes and describes each of the fifty-nine computer programs. In submitting the case to the jury, the trial court required the jury to find beyond a reasonable doubt that the appellant, either alone or acting together with another as princi-

pals fraudulently took the fifty-nine computer programs described in the indictment before they could find him guilty; or if they had a reasonable doubt thereof, to acquit him. In considering the evidence in light of the allegations in the indictment, the motion to elect was properly refused. 30 Tex.Jur.(2) 609, Sec. 41.

The evidence is sufficient to support the conviction and no error appearing, the judgment is affirmed.

Opinion approved by the court.