Rodney Leon **ALEXANDER**, Appellant,

v.

**UNITED STATES of America,**
**Appellee.**

No. 24695.

United States Court of Appeals
Fifth Circuit.

Feb. 20, 1968.

Rehearing Denied March 19, 1968.

**102**

James R. Gillespie, San Antonio, Tex., for appellant.

Andrew L. Jefferson, Jr., Asst. U. S. Atty., San Antonio, Tex., for appellee.

Before WISDOM and GOLDBERG, Circuit Judges, and INGRAHAM, District Judge.

GOLDBERG, Circuit Judge:

Rodney Leon Alexander appeals his conviction under a three-count indictment charging him with "stealing, abstracting, and removing" a total of $7.00 from the United States mail in violation of 18 U.S.C.A. § 1709. His appeal challenges the admission into evidence at his trial of six marked one-dollar bills which postal inspectors discovered in Alexander's wallet. We deny the evidentiary acceptability of these bills and reverse.

During 1966 postal inspectors in San Antonio, Texas, were bedeviled by mail thefts. Their investigation subsequently focused on Rodney Leon Alexander, a postal employee, and on August 29, 1966, they noticed the absence of three test letters after Alexander had completed his route. On September 1, 1966, two postal inspectors inserted fluropone, a powder which fluoresces in ultraviolet light, into three additional test letters and placed the letters in the collection box on Alexander's route. All three letters contained marked bills, and one of the three letters also contained an uncommon postage stamp (commemorating Humane Treatment of Animals). After the inspectors had observed Alexander pick up the mail, they reexamined the box and determined that the test letters had been taken in his pickup. The inspectors followed Alexander and noted that between the collection box and the post office he stopped off at a local grocery store. They entered the store after he had departed, purchased an item, and received in change one bill which, though not one of the marked bills, did have on it fluropone powder. Alexander's bag was examined when he arrived at the post office, and the test letters were missing.

The postal inspectors then approached Alexander as he was preparing to leave the post office in his automobile. After identifying themselves, the inspectors asked him if they could have a postage stamp which had been observed on the dash board of his car and which apparently was one commemorating Humane Treatment of Animals. Alexander agreed to let the inspectors have the stamp, which stamp later was found to fluoresce under light. Next the inspectors told him that they wished to talk to him in their office, and he agreed. At that time no statement had been made about the inspectors' purpose.[1]

Upon reaching the office Alexander was advised that the inspectors were investigating general theft of the mails, including jewelry. After this admittedly misleading purpose[2] was revealed, the

---

[1] The following excerpts from Postal Inspector McCoy's testimony on direct examination illustrate the initial secrecy of the inspectors:

"Q. All right. Now, while you are still on the parking lot, then what was the next thing that takes place? [after identifying himself and his associate as postal inspectors]
A. I asked Mr. Alexander where he had gotten this stamp which was on his dashboard. He said he didn't know. I asked him did he mind if I took it along with me and he said no.
Q. All right. Up until that point, had you given him any warning of any kind?

A. No, I had not.
* * * * *
Q. Before you requested him to go with you to the office of the superintendent, had you made any statement to him as to what you wanted with him, why you wanted to talk to him?
A. Not at that time."

[2] On cross examination Inspector McCoy admitted the disingenuous nature of the questions put to Alexander:

"Q. Now, Mr. McCoy, I could cross examine for a long time. I want to boil this down to just one part of your testimony. Among other things you said to the defendant about general loss

inspectors warned Alexander regarding his constitutional rights, and he signed a written acknowledgment that he had received the warning. When the inspectors asked him if he wanted an attorney, he replied that he had not stolen anything, particularly not jewelry, and that he did not want an attorney. Upon request, Alexander emptied his front pockets to show the absence of stolen items. The inspectors then told him that the missing items were small enough to be concealed in a wallet, and they asked him to show them the contents of his wallet. He complied, and the marked money was discovered. Alexander then confessed to his crime and took the inspectors to his car where the three test envelopes were found. The inspectors then asked Alexander if he would report back to them the next morning. He agreed to do so and did in fact comply.

▆ Prior to trial Alexander's counsel filed a motion to suppress all evidence obtained by the postal inspectors on September 1. The colloquy at the pre-trial hearing indicated that the trial court would grant the motion, but in a later,

written decision mailed to both counsel the judge admitted the physical evidence, stating that the bills "were obtained as an incident of a legal arrest made upon probable cause." The trial court's letter postures three issues for our resolution: First, what are the predicates of a postal inspector's arresting authority? Secondly, in what custodial status had the inspectors placed Alexander when the bills were obtained? And thirdly, did the voluntary production of the bills render them admissible regardless of other considerations? [3]

The government contends that postal inspectors have statutory authority to make arrests, and it cites 39 U.S.C. § 3523(a) (2) (C) and (K):

"§ 3523. Positions in salary level 12
(a) Postal Inspector (KP–32)
(1) Basic function.—* * *
(2) Duties and responsibilities—assigned territory.—

\* \* \* \* \* \*

(C) Investigates violation of postal laws, including, but not limited to, on robbery, mailing of bombs, burglary, theft of mail, embezzlements, obscene

of mail and specifically stolen jewelry or missing jewelry?
A. I said 'including some jewelry.'
Q. And you said that you talked to him about jewelry to divert his attention from the general loss of mail. Those were the words, were they not?
A. That is correct.
Q. You were going to try to trick him, weren't you? Yes or no. Let's be honest about it.
A. Yes.
Q. You were going to trick him into thinking that you were interested in the loss of jewelry, specifically, a diamond ring, and get him to waive his right of counsel in that manner, were you not?
A. That is correct."

3. The first issue has never been advanced by the defendant; however, we find it to be a basic constitutional question which is reviewable as "plain error." Fed.R. Crim.P. 52(b). On Lee v. United States, 1952, 343 U.S. 747, 750, 72 S.Ct. 967, 96 L.Ed. 1270, 1274 (at fn. 3, specifically the last paragraph); Cook v. United States, 5 Cir. 1958, 254 F.2d 871, 873; Austin v. United States, 5 Cir. 1953, 208 F.2d 420, 421. See also Williamson v. United

States, 5 Cir. 1964, 332 F.2d 123, 132 (and numerous cases cited at fn. 3 therein); Mims v. United States, 5 Cir. 1967, 375 F.2d 135, 147. We recognize our discretion to refuse consideration, On Lee v. United States, supra; Reynolds v. United States, 5 Cir. 1955, 225 F.2d 123, 132, cert. den., 1955, 350 U.S. 914, 76 S.Ct. 197, 100 L.Ed.2d 801, reh. den., 1956, 350 U.S. 929, 76 S.Ct. 301, 100 L. Ed.2d 801, reh. den., 1956, 350 U.S. 929, 100 L.Ed. 812 (discussion at fn. 12 therein); United States v. Morin, 2 Cir. 1967, 378 F.2d 472, 475, but because all three issues are vital to the admissibility question, the first issue merits analysis on our own motion. Moreover, in light of Fay v. Noia, 1963, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837, we question the wisdom of refusing to review on appeal what may return to haunt us in the form of a habeas corpus proceeding. See especially, Fay v. Noia, supra, 372 U.S. at 422–425, 83 S.Ct. 822.

We have asked for and have received a supplemental brief from the government on the first issue. The second issue was pursued by the government before the trial court below although it was not contested on appeal.

literature and pictures, and mail fraud.

\* \* \* \* \* \*

(K) In any criminal investigation, develops evidence, locates witnesses and suspects; *apprehends and effects arrest of postal offenders*, presents facts to United States attorney, and collaborates as required with Federal and State prosecutors in presentation before United States Commissioner, grand jury, and trial court." (Emphasis added.)

However convincing the words may sound out of context, 39 U.S.C. § 3523(a) (2) (C) and (K) cannot justify arrests without warrants by postal inspectors. The section was enacted as part of the "Postal Field Service Compensation Act of 1955," the purpose of which act was set out in H.Rep.No. 728, 84 Cong. 1st Sess., 1955 Code Cong. § Adm.News, p. 1994:

"It is the purpose of this legislation to provide an *increase in the compensation* of postal employees and, at the same time, bring about correction of serious inequities in the salary schedule by the adoption of an improved method of *classifying* postal employees

*for salary purposes.*" (Emphasis added.)

Section 3523 is one of many sections in the 1955 act which established postal salary levels by job descriptions rather than by mere job titles, as in prior acts. The purpose of the bill was to classify existing duties, not to create new authority. We do find a congressional grant of limited police authority to postal inspectors in 39 U.S.C. § 903, but that provision, not part of the 1955 act, requires an authorizing letter by the Postmaster General, and even with this safeguard contains no mention of police authority over an individual.[4] We read Section 903 as clearly indicating that Congress did not intend to vest postal inspectors with arresting powers.

Furthermore, the so-called authorizing words in Section 3523(a) (2) (K), "apprehends and effects arrests of postal offenders," are weak and ambiguous. They were not molded in the image of other arrest statutes—see, for example, 18 U.S.C. § 3052 (*"Powers of Federal Bureau of Investigation"*. Emphasis added.)[5] and 18 U.S.C. § 3053 (*"Powers of Marshals and Deputies."* Emphasis added.)[6]—and do not include any reference to arrest warrants, probable cause,

4. "§ 903. Searches authorized
The Postmaster General, by letter of authority filed in the Department, may authorize any postal inspector or other officer of the Department to make searches for mailable matter transported in violation of law. When the authorized officer has reason to believe that mailable matter transported contrary to law may be found therein, he may open and search any—
(1) vehicle passing, or having lately passed, from a place at which there is a post office of the United States;
(2) article being, or having lately been, in the vehicle;
(3) store or office, other than a dwelling house, used or occupied by a common carrier or transportation company, in which an article may be contained."

5. "§ 3052. Powers of Federal Bureau of Investigation
The Director, Associate Director, Assistant to the Director, Assistant Directors, inspectors, and agents of the

Federal Bureau of Investigation of the Department of Justice may carry firearms, serve warrants and subpoenas issued under the authority of the United States and make arrests without warrant for any offense against the United States committed in their presence, or for any felony cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony."

6. "§ 3053. Powers of marshals and deputies
United States marshals and their deputies may carry firearms and may make arrests without warrant for any offense against the United States committed in their presence, or for any felony cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony."

or immediacy. Can it be that Congress in its wisdom restricted the F.B.I. but gave postal inspectors carte blanche in arresting "postal offenders"?

The only plausible explanation of Section 3523 is that the words do not give postal inspectors the authority to "arrest." He investigates and, in aiding those with arresting authority, "apprehends and *effects* arrests." He furnishes the predicate for others to make the arrest and then aids them in the arresting process. But he is not a policeman. We should not have policemen by inference, and persons should not be vested with arresting authority by statutory obliqueness.

In 1948, before the 1955 act, a federal district court stated:

"It suffices that a postal inspector has no authority to make an arrest. It follows he has no authority either to make a search or to seize articles." United States v. Helbock, D. Oregon 1948, 76 F.Supp. 985, 986.

*Helbock* has been cited by two circuits in cases decided after the 1955 act, which circuits, rather than deciding the effect of Section 3523, have categorized the arrests as valid citizens' arrests under state law. Wion v. United States, 10 Cir. 1963, 325 F.2d 420, 423, cert. den., 1964, 377 U.S. 946, 84 S.Ct. 1354, 12 L.Ed.2d 309; and Ward v. United States, 9 Cir. 1963, 316 F.2d 113, 118, cert. den., 1963, 375 U.S. 862, 84 S.Ct. 132, 11 L.Ed.2d 89. Their silence in the face of Section 3523 indicates a reluctance to be impressed by the supposed Congressional grant.[7] We find inconclusive and certainly not controlling an occasional iteration of Section 3523(a) (2) (K) without analysis. See Kelley v. Dunne, 1 Cir. 1965, 344 F.2d 129, 130. Such unanalytical affirmations when arresting authority is not in issue can have little more significance than the statute itself. We have found no court to be so uncritically docile when the point has been in issue.

We now proceed from the specific arrest provision of Section 3523 to the state law of citizens' arrests. The relationship of state and federal arresting authority has modern origins in the 1948 Supreme Court case of United States v. Di Re, 1948, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210. In *Di Re* the court cited a 1789 federal statute which had formalized the congressional intent to respect state arresting regulations even for federal arrests.[8] The Court then updated that statute through judicial incorporation:

"We believe, however, that in absence of an applicable federal statute the law of the state where an arrest without warrant takes place determines its validity. By one of the earliest acts of Congress, the principle of which is still retained, the

---

7. We note the following two excerpts from Ward v. United States, supra. On page 118 the court disavows either position regarding Section 3523:
"We have not here passed upon the right of the postal inspectors, other than as private citizens, to make an *arrest*. The government urges they do. See 39 U.S.C. § 3523(a) (2) (K), where it is implied that they have such authority. We do not meet that question, as it is here unnecessary." However, two pages earlier the court states the following conclusion: "There apparently is no federal law authorizing postal inspectors to make official arrests, i. e., because of their employment. And see United States v. Helbock, D.C.Or., 76 F.Supp. 985."

8. The 1787 statute, concerning arrests with warrants, provided:
"That for any crime or offence against the United States, the offender may, by any justice or judge of the United States, or by any justice of the peace, or other magistrate of any of the United States where he may be found *agreeably to the usual mode of process against offenders in such state*, and at the expense of the United States, be arrested, and imprisoned or bailed, as the case may be, for trial before such court of the United States as by this act has cognizance of the offence." (Emphasis added.)
The modern counterpart of that statute is 18 U.S.C.A. § 3041 (Supp. 1967), but it has been altered to correspond to increasing regulation of the arresting process.

arrest by judicial process for a federal offense must be 'agreeably to the usual mode of process against offenders in such State.' [quoting the 1789 statute in a footnote] There is no reason to believe that state law is not an equally appropriate standard by which to test arrests without warrant, except in those cases where Congress has enacted a federal rule. Indeed the enactment of a federal rule in some specific cases seems to imply the absence of any general federal law of arrest.

"Turning to the Acts of Congress to find a rule for arrest without warrant, we find none which controls such a case as we have here and none that purports to create a general rule on the subject. If we were to try to find or fashion a federal rule for arrest without warrant, it appears that the federal legislative materials are meager, inconsistent and inconclusive.

\*     \*     \*     \*     \*     \*

"No act of Congress lays down a' general federal rule for arrest without warrant for federal offenses. None purports to supersede state law. And none applies to this arrest which, while for a federal offense, was made by a state officer accompanied by federal officers who had no power of arrest. Therefore the New York statute provides the standard by which this arrest must stand of fall." 332 U.S. at 589–591, 68 S.Ct. at 226.

The *Di Re* doctrine has been restated continually since its origin and has received Supreme Court reaffirmation in Ker v. State of California, 1963, 374 U.S. 23, 37, 83 S.Ct. 1623, 1632, 10 L.Ed.2d 726, 740. We have found no Supreme Court opinion which has applied the doctrine to uphold an arrest by a federal officer as a valid citizen's arrest under state law. However, Circuit Courts have applied the *Di Re*

language without regard to whether a state officer had assisted in the arrest (as occurred in *Di Re* and *Ker*) [9] or whether only federal agents were involved. In United States v. Viale, 2 Cir. 1963, 312 F.2d 595, cert. den., 1963, 373 U.S. 903, 83 S.Ct. 1291, 10 L.Ed.2d 199, for example, the Second Circuit quoted *Di Re* and then turned to the citizens' arrest law of New York for determining the validity of an arrest by Special Agents of the Internal Revenue Service. Other cases citing *Di Re* have included United States v. Luster, 6 Cir. 1965, 342 F.2d 763, 765 (at [4]), cert. den., 1965, 382 U.S. 819, 86 S.Ct. 45, 15 L.Ed.2d 66, (Federal Narcotics Agents) and in our own Circuit, Mauldin v. United States, 5 Cir. 1964, 328 F.2d 779, 780–781 (state agents merely identified defendants for a federal agent who made the arrest). The Ninth and Tenth Circuits in *Ward,* supra, and *Wion,* supra, followed the *Di Re* reasoning without citing the case.

Having accepted the possibility of validation under state law, we must review the two relevant state statutes. Article 18.22, Vernon's Ann.Texas Code of Criminal Procedure, provides:

"*All persons* have a right to prevent the consequences of theft by seizing any personal property which has been stolen, and bringing it, with the supposed offender, if he can be taken, *before a magistrate for examination, or* delivering the same *to a peace officer* for that purpose. *To justify such seizure,* there must, however, be reasonable ground to suppose the property to be stolen, and *the seizure must be openly made and the proceedings had without delay."* (Emphasis added.)

Article 14.01, Texas Code of Criminal Procedure, provides:

"A peace officer *or any other person,* may, without warrant, arrest an offender when the offense is committed

---

9. See also Johnson v. United States, 1948, 333 U.S. 10, 15, 68 S.Ct. 367, 92 L.Ed. 436, 441 (at fn. 5) and Miller v. United States, 1958, 357 U.S. 301, 305, 78 S.Ct. 1190, 2 L.Ed.2d 1332, 1336.

in his presence or within his view, if the offense is one classed as a felony, or as an offense against the public peace." (Emphasis added.)

Article 14.01 must be read in connection with Article 14.06 which provides:

"In each case enumerated in this Code, the person making the arrest shall immediately take the person arrested before the magistrate who may have ordered the arrest or before some magistrate of the county where the arrest was made without an order. The magistrate shall immediately perform the duties described in Article 15.17 of this Code."

Thus, arrests under both 18.22 and 14.01 must be followed by immediate removal to a magistrate or a peace officer in order to be legal. The purpose is obvious: every citizen cannot be allowed indiscriminately to play the role of a cop. Because the inspectors in this case failed to take Alexander to a magistrate or to a peace officer, we will consider only that statutory mandate and will not explore the statutory definitions of "theft," "felony," and "committed in his presence or within his view."

In 1943 the Texas Supreme Court allowed a civil action for false imprisonment where a sheriff had arrested the plaintiff, had detained him "from one to three hours" in the sheriff's office at the county seat, and then had released him when no complaint was filed. Among other justifications for the action of false imprisonment was the following:

"Moreover, if Heath's arrest had been authorized by the statutes, his subsequent detention as pleaded and proved would make a case of false imprisonment against Boyd. The undisputed facts are that after his arrest Heath rode with the sheriff to the former's car, which he then entered and drove several miles to the courthouse, followed by Boyd. There he was detained in Boyd's office from one to three hours, while Boyd was seeking advice by telephone as to what

to do, in the face of a plain statutory command as to what must be done in all cases of arrest without warrant. Art. 217, C.C.P. 1925, provides, 'In each case enumerated in this chapter, the person making the arrest shall immediately take the person arrested * * * before the nearest magistrate where the arrest was made without an order.' Substantially the same requirement appears in Art. 325, C.C.P. 1925 [the predecessor of Article 18.22], and Art. 487, P.C. 1925.

\* \* \* \* \* \*

He was under a positive duty immediately to seek a magistrate. That such failure, unexcused, makes a case of false imprisonment, as a matter of law, is held by all the authorities. [authorities cited]" Heath v. Boyd, 175 S.W.2d 214, at 217.

Heath v. Boyd has been cited quite favorably at least twice by the Texas Court of Criminal Appeals. In Moore v. State, 1946, 149 Tex.Cr.R. 229, 193 S.W.2d 204, 208 that Court remarked: "It might be insisted that the announcement in Heath v. Boyd was 'dicta', but the legal proposition appears to be sound." Twelve years later the same court referred to "the landmark decision in Heath v. Boyd." McCrady v. State, 1958, 166 Tex.Cr.R. 509, 316 S.W.2d 408, 410. See also Lubbock Bail Bond v. Joshua, Tex.Civ.App.1967, 416 S.W.2d 523, 529, no writ history. (Heath v. Boyd referred to as "a very able and sound opinion").

The actions of the two postal inspectors are easy prey to the Heath v. Boyd doctrine as accepted by the Texas Court of Criminal Appeals. Alexander was not detained as long as was Heath, but he was detained long enough to have been questioned and "searched" (using the trial court's categorization), to have given a confession, and to have witnessed his car's being searched. During the crucial part of the questioning he was purposely misinformed as to the nature of their quest. Finally, after having been put through the entire process, instead of being taken to a magistrate, he

was told to report to the same office the next day.

The government cites Lasker v. State, 1956, 163 Tex.Cr.R. 337, 290 S.W.2d 901, and Hancock v. State, Tex.Cr.App.1966, 402 S.W.2d 906, 909, as case authority for the arrest of Alexander. In the *Hancock* case no arrest was made and the seized evidence was immediately forwarded to the custody of the police. *Lasker* is more nearly in point in that the court there allowed a store detective to arrest a customer, escort her to the store office, and seize a marked ten-dollar bill which the customer had stolen from another customer. However, no mention was made of a drawn-out detention process which, as here, did not even reach completion in one day. Therefore, we must assume that Lasker was taken immediately to a magistrate, or, as the statute also allows, to the custody of a peace officer. Moreover, here we have meritricious activities of arresting persons which we do not find in the *Lasker* case.

█ Having established the inspectors' inability to arrest Alexander without immediate magistrate confrontation, we must next determine if he was in fact ever placed under arrest on September 1. We consider the question despite the government's assurance of the arrest in its appellate brief:

"[T]he currency was admissible because it had been obtained from appellant incidental to and contemporaneous with a lawful arrest."

To be sure, we accept Justice Clark's proposition in his dissent in Henry v. United States, 1959, 361 U.S. 98, 104–

105, 80 S.Ct. 168, 172, 4 L.Ed.2d 134, 140:

"While the Government, unnecessarily it seems to me, conceded that the arrest was made at the time the car was stopped, this Court is not bound by the Government's mistakes."

Moreover, we have studied the trial court proceedings, during which the inspectors denied any intent to arrest Alexander. Nevertheless, we find sufficien justification for the government's appellate position (and, we might add, the same position advanced in their final memorandum to the trial court in opposition to the defendant's motion to suppress evidence). The trial court likewise found an arrest, both in oral comments during the pre-trial hearing and in his final letter to counsel before the trial.[10]

To codify "arrest" by requiring such prerequisites as the laying on of hands or the use of magic words would be to defy reality. An invitation of one claiming police authority does not have the options attendant upon a bid to a ball. Even assuming that the inspectors did not intend to arrest Alexander to obtain evidence, the period of interrogation could have been a putative arrest from Alexander's viewpoint. Alexander's fear of police power is certainly as reasonable an explanation for his docility as innate friendliness.

Although we have consistently used the term "arrest," we add that any arguable distinction between "arrest" and "detention" is not vital to this decision. We are not reviewing the actions of one specifically authorized to protect the public.[11] The inspectors' chameleonic tactics, i. e., arresting as federal officers and claiming legality as

---

10. In this regard compare Allen v. United States, 5 Cir. 1967, 384 F.2d 926, in which the trial court rejected the defendant's claim that he had been taken into custody by postal inspectors, and we summarily upheld that finding. The Supreme Court's reliance on trial court findings is shown in Rios v. United States, 364 U.S. 253, 261–262, 80 S.Ct. 1431, 4 L.Ed.2d 1688, 1694, in which the Court returned the case to the trial court for a determination of when the arrest took place.

11. Cf. Granza v. United States, 5 Cir. 1967, 377 F.2d 746, 749–750, cert. den., 1967, 389 U.S. 939, 88 S.Ct. 291, 19 L.Ed. 2d 292, and Rogers v. United States, 5 Cir. 1964, 330 F.2d 535, 538–539, cert. den., 1964, 379 U.S. 916, 85 S.Ct. 265, 13 L.Ed.2d 186.

state citizens, cannot vest them with more rights than those granted by the Texas statutes. These statutes are careful in prescribing safeguards which must be respected in a citizens' arrest, and rigid compliance must be required when citizens detain others for what may constitute even a putative arrest. To allow detention, interrogation, and trickery by every self-appointed detective—even by every holder of a title or a badge—would invite Orwellian intrusions into our lives. We cannot allow untrained vigilantes to intimidate others and then later to deny any restrictive intent.

By appraising Alexander's status as under arrest and by poisoning the arrest with illegality, we leave little room for allowing any "fruit of the poisonous tree" into evidence. The Supreme Court has set the well-quoted standard for determining whether evidence is to be labeled as "fruit of the poisonous tree" and thus excluded from trial:

> "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959)." Wong Sun v. United States, 1963, 371 U.S. 471, 487–488; 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455.[12]

In *Wong Sun* the court found that because one defendant had been released after his arrest and had made his prejudicial statements a few days later, the evidence "had become so attenuated as to dissipate the taint" of his illegal arrest. This court has found similar dissipation in recent cases. Thomas v. United States, 5 Cir. 1967, 377 F.2d 118, 120; Rogers v. United States, supra note 11, 330 F.2d at 542. Moreover, in Manuel v. United States, 5 Cir. 1966, 355 F.2d 344, 348, we affirmed the trial court's admission of a defendant's handwriting specimens despite the fact that they were taken incident to an illegal arrest. In that case we found controlling "appellant's voluntary furnishing of the specimens after being specifically warned of his right to remain silent and of his right not to furnish any handwriting." We added:

> "Under these circumstances, we agree with what was said in Burke v. United States, 1st Cir. 1964, 328 F.2d 399, cert. denied, 379 U.S. 849, 85 S.Ct. 91, 13 L.Ed.2d 52:
>
> > 'But not every statement or surrender of property made during an illegal arrest is created inadmissible because of the illegal arrest. "(T)hat fact does not require the rejection of evidence volunteered by [the defendant] for reasons sufficient to himself and made without force or compulsion or promise of reward." Gibson v. United States, 80 U.S.App.D.C. 81, 149 F.2d 381, 384 (1945); United States v. Busby, 126 F.Supp. 845 (D.D.C.1954).'"

We read both *Manuel* and *Burke* to require careful scrutiny for any "force or compulsion" which may preclude voluntary choice by the defendant. In Miranda v. State of Arizona, 1966, 384 U.S. 436, 476, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694, 725, 10 A.L.R.3d 974, the Supreme Court stated:

> "Moreover, any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege. The requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary

---

12. The impact of *Wong Sun* was analyzed by Judge Wisdom one year later in Rogers v. United States, supra note 11, 330 F.2d at 540–542. And for a one-hundred-thirty page treatment of the case, see Broeder, "Wong Sun v. United States; A Study in Faith and Hope," 42 Nebraska L.Rev. 483 (1963).

ritual to existing methods of interrogation."

The *Miranda* rule, although applying only indirectly in this case, aoes stress judicial skepticism in reviewing the contention that a man in custody, without legal counsel and faced only by his arresting officers, voluntarily waives his rights. This same skepticism prevents Alexander's compliance from purging the taint of the illegal arrest. There was no disjuncture between the come-with-me and the handing over of the wallet. The intermittent time was, in fact, filled with a fraudulent warning in order to receive a waiver of constitutional rights and disingenuous questioning to mislead Alexander and thus obtain the wallet. Only after the inspectors had obtained the incriminating evidence did they admit to Alexander that he was being investigated for stolen bills.

Intimidation and deceit are not the norms of voluntarism. In order for the response to be free, the stimulus must be devoid of mendacity. We do not hesitate to undo fraudulently induced contracts. Are the disabilitie here less maleficent? In a case which deals with a quite similar issue of police camouflage, the Second Circuit concluded with the following words:

"Although the line between an accused's voluntary consent and his involuntary submission to police authority is often difficult to draw, we are persuaded that on the record before us there has not been a sufficient showing of true consent, free from chicanery or compulsion. To hold otherwise in these circumstances would, as the late Justice Jackson once eloquently remarked, 'obliterate one of the most fundamental distinctions between our form of government, where officers are under the law, and the police-state where they are the law.' Johnson v. United States, 333 U.S. 10, 17, 68 S.Ct. 367, 370, 92 L.Ed. 436 (1948). The civilized standards of fundamental fairness developed over the years in this area must be zealously guarded by the trial and appellate courts if the guarantees of the Bill of Rights are to be kept meaningful and not permitted to evaporate through silent abrogation." United States v. Como, 2 Cir. 1965, 340 F.2d 891, 894–895.

Reversed.