MARTIN, Circuit Judge,
dissenting:
The Majority describes this case as raising the question of whether “deception by law enforcement” during the search of a home violates the Fourth Amendment of the United States Constitution. Among other things, the Fourth Amendment'protects the “right of the people to be secure in their [ ] houses,” and requires that warrants allowing a home to be searched, issue “upon probable cause, supported by Oath or affirmation.” The two officers here had no warrant allowing their entry into the home of Eric Spivey and Chenequa Austin. Instead, they had a plan to get around the Fourth Amendment’s protections. They lied about their legal authority. They lied about their real reason for being there. And they took advantage of a public trust in law enforcement in order to search the Spivey/Austin home without a warrant. When Ms. Austin learned the true purpose of the officers’ presence in her home, she stopped cooperating immediately. Based on all the circumstances of her case, it is clear to me that Ms. Austin’s permission for the officers to enter her home was not voluntarily given.
This litigation could have easily been avoided. Instead of planning their ruse, the officers could have gotten a warrant. We know that “[w]ith few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no.” Kyllo v. United States, 533 U.S. 27, 31, 121 S.Ct. 2038, 2042, 150 L.Ed.2d 94 (2001) (Scalia, J.). There is no exception that fits this case. I am concerned that the Majority opinion blesses the deliberate circumvention of constitutional protections, and in this way undermines the public trust in police. I therefore dissent.
I. BACKGROUND
There is no dispute about the facts here. The two officers who conducted the search, Special Agent Lanfersiek and -Detective Iwaskewyez, both testified at a suppression hearing, and told us what happened. I will add some detail taken from their testimony, which is necessary to fully understand why this search was not lawful.
The Majority opinion misses the fact that Agent Lanfersiek and Detective Iwas-kewycz deliberately planned how to circumvent the Fourth Amendment’s general requirement that they g;et a warrant before searching someone’s home. Agent Lanfersiek testified that instead of getting a warrant, he and about ten other officers *1219 held a planning session during which they “made a decision to come up with the methodology of employing the ruse.” They decided to pretend to investigate burglaries that had already been solved, as a way to get consent to enter the home and search for evidence of credit-card fraud. To avoid suspicion, they also came up with the idea of Agent Lanfersiek dressing up as a crime-scene technician. Agent Lanfer-siek is a Special Agent of the U.S. Secret Service, and in that job had no authority to investigate a local burglary. Neither, apparently, did he know how to dust for fingerprints. Nevertheless, this ploy, together with the costume he wore, gave him cover. Wearing his costume, he went through the Spivey/Austin home pretending to dust for fingerprints, asking for and receiving permission from Ms. Austin to go into areas of the home she likely would not have otherwise let him see. The officers hoped they would be able to see evidence of credit-card fraud in plain view. And if they did, they planned on using the evidence they had seen to get consent to search the rest of the home. In the event this plan did not-work, the officers had an assistant state attorney on standby ready to get a search warrant.
There is also more to the order of events here than the Majority opinion includes. The officers testified that when they arrived at Ms. Austin’s home, she was “genuinely excited,” “relieved,” and “happy” they were there to follow-up on the reported burglaries of her home. Agent Lanfer-siek asked Ms. Austin to show him where the burglar entered the house so he could dust for fingerprints. She did. After pretending to dust the door, he asked Ms. Austin where else the burglar had gone. She said the bedroom, and Agent Lanfer-siek asked to go there. Ms. Austin took him into the bedroom, where Agent Lan-fersiek asked if she would open the drawers to the bedside tables. Again, Ms. Austin complied. Agent Lanfersiek asked where else the burglar had gone. Ms. Austin replied the bathroom and closet areas, so he went to see those as well.
Agent Lanfersiek saw evidence of' credit-card fraud in plain view in these different areas. He and Det. Iwaskewycz then decided to separate Mr. Spivey and Ms. Austin and talk to them individually. This is where the ruse ended. Det. Iwaskewycz went outside with Ms. Austin and explained to her that he was really there to investigate credit-card fraud. He asked about the evidence in the bedroom. Ms. Austin gave some unconvincing answers. As a result, Det. Iwaskewycz decided Ms. Austin was not likely to cooperate and provide the consent to the full search he and Agent Lanfersiek wanted. So he called a colleague to run a check on Ms. Austin. He discovered there was an unrelated outstanding warrant for Ms. Austin’s arrest. Ms. Austin was promptly arrested.
II. STANDARD OF REVIEW
Although voluntariness is usually a question of fact, the parties do not dispute the facts and both rely solely on the testimony of the government’s witnesses. In a case like this, our review is de novo. United States v. Valdez, 931 F.2d 1448, 1451-52 (11th Cir. 1991); United States v. Garcia, 890 F.2d 355, 359-60 (11th Cir. 1989).
III. DISCUSSION
The Fourth Amendment generally prohibits officers from searching a person’s home without a warrant. Payton v. New York, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980) (“[Searches . and seizures inside a home without a warrant are presumptively unreasonable.”). One exception to the warrant requirement is where the person voluntarily gives consent for the officers to search. Illinois v. *1220 Rodriguez, 497 U.S. 177, 181, 110 S.Ct. 2793, 2797, 111 L.Ed.2d 148 (1990). The question before us here is whether Ms. Austin’s consent for the officers to search her home was voluntary.
A. VOLUNTARINESS PRECEDENT
Consent is voluntary “if it is the product of an ‘essentially free and unconstrained choice.’ ” United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001) (quoting Schneckloth, 412 U.S. at 225, 93 S.Ct. at 2047). We evaluate whether a consensual search was voluntary by examining the “totality of the circumstances” in each case. United States v. Yeary, 740 F.3d 569, 581 (11th Cir. 2014). It is the government’s burden to prove both that consent was given and that it was “given freely and voluntarily.” Id. (quotation omitted).
In analyzing the totality of the circumstances, there is no one factor that controls. Schneckloth, 412 U.S. at 226, 93 S.Ct. at 2047. Instead this Court recognizes several important factors to consider “including the presence of coercive police procedures, the extent of the defendant’s cooperation with the officer, the defendant’s awareness of his right to refuse consent, the defendant’s education and intelligence, and the defendant’s belief that no incriminating evidence will be found.” Purcell, 236 F.3d at 1281.
This Court has also said that consent searches are almost always unreasonable when government agents induce consent by “deceit, trickery or misrepresentation.” United States v. Tweel, 550 F.2d 297, 299 (5th Cir. 1977).[1] In Tweel, for example, the defendant was audited by the IRS. Id. at 298. The defendant wanted to know whether the IRS interest in him was related to a civil or a criminal case, so his accountant asked whether a special agent was involved. See id. The IRS truthfully replied that no special agent was involved, but purposefully did not say that 'the inquiry was being made on behalf of the Organized Crime and Racketeering Section of the Department of Justice. Id. Because of that deliberate omission, this Court said the “investigation was a sneaky deliberate deception” that rendered the defendant’s consent involuntary. Id. at 299.[2]
Eleventh Circuit precedent about consenting to a search emphasizes that the use of deception to get consent violates the Fourth Amendment because it is an “abuse” of the public’s trust in law enforcement. See id.; see also SEC v. ESM Gov’t Sec., Inc., 645 F.2d 310, 316 (5th Cir. Unit B May 18, 1981). For example, in ESM, this Court said:
We believe that a private person has the right to expect that the government, when acting in its own name, will behave honorably. When a government agent presents himself to a private individual, and seeks that individual’s cooperation based on his status as a government agent, the individual should be able to rely on the agent’s representations. We think it clearly improper for a govern *1221 ment agent to gain access to [evidence] which would otherwise be unavailable to him by invoking the private individual’s trust in his government, only to betray that trust. When that government agency then invokes the power of a court to gather the fruits of its deception, we hold that there is an abuse of process.
Id. Thus, Eleventh Circuit precedent requires us to consider whether the public trust was improperly employed by the officers.
B. THE TOTALITY OF THE CIRCUMSTANCES
Considering the totality of the circumstances under the standards set by our precedent, Ms. Austin’s consent was not voluntary. The officers used deceit, trickery, and misrepresentation to hide the true nature and purpose of their investigation as well as the authority they had to investigate the burglaries. This deception caused Ms. Austin to allow the officers into her home. And when the officers revealed the ruse to Ms. Austin, she immediately stopped cooperating.
First, the officers got consent from Ms. Austin to enter her home only through the deliberate misrepresentation of their authority. As the Majority rightly recognizes, “deception invalidates consent when police claim authority they lack.” Maj. Op. at 1213. Agent Lanfersiek testified that as a federal Secret Service agent, he was not at the Spivey/Austin home about a burglary. And the government conceded at oral argument that Agent Lanfersiek, as a federal agent, had no authority to investigate a' local burglary. Knowing that his presence might alert Ms. Austin to the true purpose of his investigation, Agent Lanfersiek hid his real identity. He pretended to be a member of the Lauderhill Police Department and played the part of a crime-scene technician because that role’ was best suited to convince Ms. Austin to allow him into parts of her home she would otherwise have refused. Agent Lanfersiek’s misrepresentations allowed him to ask Ms. Austin — without raising suspicion — to show him around her home, let him into her bedroom, and even open drawers and look inside her closet. In other words, Agent Lanfersiek lied about his law enforcement authority in order to gain warrantless access to the most private areas of Ms. Austin’s home. See Tweel, 550 F.2d at 299; see also ESM, 645 F.2d at 316 (“When a government agent presents himself to a private individual, and seeks that individual’s cooperation based on his status as a government agent, the individual should be able to rely on the agent’s representations.”). Had Ms. Austin known Agent Lanfersiek’s true identity, this record shows she would not have let him into her home.[3]
Neither was Det. Iwaskewycz there to investigate the burglaries. Athough he was employed by. the local police department, his duties did not include investigating burglaries. Instead, he was assigned to the federally-funded South Florida Organized Fraud Task Force. The task force paired Secret Service agents with local detectives to combat financial crimes in the Southern District of Florida. Det. Iwas-kewycz had been assigned to this task force for several years. And he testified *1222 that although the case of the burglary of the Spivey/Austin home was still technically an open file, he knew the burglar had been caught and confessed to burglarizing the Spivey/Austin home. He also testified that the case had been officially closed by the neighboring police department that caught the burglar. Thus, even aside from the fact that Det. Iwaskewycz’s job did not include investigating burglaries, he would not have been at the Spivey/Austin home for that reason anyway. The burglary was already solved. This record shows he lied about why he was at the home and about who Agent Lanfersiek was. See ESM, 645 F.2d at 316.
Second, the officers methodically planned their deception. Well in advance of the search, Agent Lanfersiek convened a team of about ten law enforcement officers to make a plan which would circumvent the Fourth Amendment’s warrant requirement. This fact also supports the conclusion that Ms. Austin’s consent was not voluntary. The Supreme Court has told us to be wary of police planning around constitutional protections. See Missouri v. Seibert, 542 U.S. 600, 617, 124 S.Ct. 2601, 2613, 159 L.Ed.2d 643 (2004) (holding that “[sjtrategists dedicated to draining the substance out of’ constitutional protections cannot accomplish by planning around these protections because it “effectively threatens to thwart [their] purpose”). The Eleventh Circuit has also adhered to this principle. We have refused to “allow the state to secure by stratagem what the fourth amendment requires a warrant to produce.” Graves v. Beto, 424 F.2d 524, 525 (5th Cir. 1970).
Third, and importantly, this record demonstrates that Ms. Austin refused to cooperate with law enforcement once the officers revealed their true purpose.[4] This shows she would not have allowed the officers into her home had they not lied about their authority and their reason for wanting to get into her house. Before the officers told her they were there to investigate credit-card fraud, they testified Ms. Austin was “genuinely excited,” “relieved,” and “happy” they were there to follow-up on the burglaries — crimes of which Ms. Austin was the victim. Once the officers’ true purpose was revealed, her demeanor changed so much that Agent Lanfersiek had a colleague run a check for any outstanding arrest warrants. After finding one, he arrested Ms. Austin and had her taken to the police station. As this Court has put it, deceit is not one of “the norms of voluntarism.” Alexander v. United States, 390 F.2d 101, 110 (5th Cir. 1968). “In order for the response to be free, the stimulus ipust be devoid of mendacity.” Id. Ms. Austin’s response, then, could not have been free, because it was entirely a product of the officers’ untruthfulness.[5]
*1223 Given these facts, I expected this panel to suppress the search of the Spivey/Austin home. It is true, as the Majority says, that not all police deception is unconstitutional.[6] Maj. Op. at 1213-14. But the police deception here is unconstitutional because it meant that Ms. Austin’s consent was not knowing and voluntary. My read of the Majority opinion is that it tries to distinguish the police deception here from what this Court’s precedent says is unconstitutional conduct, mainly by relying on two cases: United States v. Wuagneux, 683 F.2d 1343 (11th Cir. 1982), and United States v. Prudden, 424 F.2d 1021 (5th Cir. 1970). Maj. Op. at 1214-15. Although the Majority is again correct that voluntary consent can carry with it the risk that officers may discover evidence of criminal behavior, see Wuagneux, 683 F.2d at 1348, we are still required to look to whether the initial consent was voluntary. In Wuagneux, for example, the defendant knew he was being investigated by the IRS. See id. The officers here, by contrast, told Ms. Austin they were there to help her. As a victim of crime, her acceptance of the officers’ offer of help made sense. But in fact, the officers relied on Ms. Austin’s trust to manipulate her, and gave no indication that she was actually the one being investigated. See Tweel, 550 F.2d at 299 (“[T]he agent’s failure to apprise the [defendant] of the ... nature of this investigation was a sneaky deliberate deception....”); ESM, 645 F.2d at 316 (“We think it clearly improper for a government agent to gain access to [evidence] which would otherwise be unavailable to him by invoking the private individual’s trust in his government, only to betray that trust.”).[7]
The Majority also points to Prudden to say that not all deception makes a search’ unreasonable. Maj. Op. at 1214. But Prudden only shows how far the officers in this case went beyond the line of what’s constitutional. In Prudden, the government agent “in no way concealed his true identity.” 424 F.2d at 1032. We simply have a different case here.
IV. CONCLUSION
“It is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.” Welsh v. Wisconsin, 466 U.S. 740, 748, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984) (quotation omitted). That is why we presume warrantless searches of the home are unreasonable. Kentucky v. King, 563 U.S. 452, 459, 131 S.Ct. 1849, 1856, 179 L.Ed.2d 865 (“It is a basic principle of Fourth Amendment law, we have often said, that searches and seizures inside a home without a warrant are presumptively unreasonable.” (quotation omitted)). This is also why the Supreme Court has long in-centivized law enforcement to get a warrant, rather than resort to warrantless entries. See, e.g., Ornelas v. United States, *1224 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996).
At oral argument, the government was asked why it did not simply get a warrant, rather than using the ruse to get into the house. The government did not say it lacked probable cause.[8] Neither did it say it would have been too burdensome. Indeed, this record reflects that the officers had an assistant state attorney on standby in case their ruse did not succeed. What the government said was that there was “no requirement” to get a warrant.
The Majority opinion tells police that what happened here is not a problem. In effect, it teaches police they don’t need to get a warrant so long as they can pre-plan a convincing enough ruse. This is true even if, as here, that ruse includes skirting the limits of the officer’s legal authority to investigate only certain crimes. In doing so, I fear the Majority opinion undermines the public’s trust in the police as an institution together with the central protections of the Fourth Amendment. When I read the record in Ms. Austin’s case, I don’t believe this is the “reasonable” conduct our Founders had in mind when drafting the Fourth Amendment. I therefore dissent.

. In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981. Id. at 1209.

. The Majority says this Court has "never applied fTweel] outside the administrative context, let alone to a situation in which the suspect is aware of the criminal nature of the investigation.” Maj. Op. at 1213 (emphasis added). But three of my colleagues on this Court did just that in a recent unpublished decision. See United States v. Jaimez, 571 Fed.Appx. 935, 937 (11th Cir. 2014) (per curiam) (unpublished) (citing Tweel for the proposition that "[w]e have found that consent 'induced by deceit, trickery, or misrepresentation' can render consent involuntary” in the context of a consent search of a defendant’s home for contraband).

. The Majority says that the burglaries were a legitimate reason for the officers to be at Ms. Austin's home. Maj. Op. at 1214-15. But even setting aside the legal authority issues already discussed, the fact that other officers might have been able to investigate the burglaries through a warrantless consent search does not make the consent here voluntary. See Kyllo, 533 U.S. at 35 n.2, 121 S.Ct. at 2043 n.2 ("The fact that equivalent information could sometimes be obtained by other means does not make lawful the use of means that violate the Fourth Amendment.”).

. The Majority says the pretext for investigating the burglary is not relevant. Maj. Op. at 1215 (citing Whren v. United States, 517 U.S. 806, 814, 116 S.Ct. 1769, 1775, 135 L.Ed.2d 89 (1996)). But Whren was about inquiries into whether probable cause exists, which are made from a law enforcement officer's perspective. In contrast, when we decide whether Ms. Austin's consent was voluntary, we must consider Ms. Austin's subjective perspective. The Majority acknowledges this. See Maj. Op. at 1215; Schnecldoth, 412 U.S. at 229, 93 S.Ct. at 2049 (noting that "[t]he very object of the inquiry” in determining volun-tariness is “the nature of a person’s subjective understanding”). The pretext of investigating a burglary was not a "silent” motivation as the Majority says, but. was instead the express reason given to Ms. Austin that led her to let the officers into her home. Maj. Op. at 1215.

. These circumstances show that, contrary to the Majority’s assertion, Agent Lanfersiek’s position was material to Ms. Austin’s consent. See Maj. Op. at 1215. His deception and misrepresentation was not just "perhaps silly,” as the Majority describes it. Id. He lied about his true legal authority so that the ruse could succeed.

. The Majority provides undercover operations as an example. Maj. Op. at 1213-14. This was not an undercover operation. Indeed, we have specifically distinguished undercover .operations from the type of deceit used here. See United States v. Centennial Builders, Inc., 747 F.2d 678, 682-83 (11th Cir. 1984) (distinguishing undercover investigations from consent to search “obtained through deception”).

. The Majority says that a warning of the right to refuse consent is less relevant in this context "because it is easier to refuse consent when the police are offering to help than when [the police] initiate an adversarial relationship.” Maj. Op. at 1216. The Majority cites no legal authority for this proposition, and in any event, the government had the burden of proving the opposite in this case — that had Ms. Austin been aware of the adversarial nature of the investigation she would still have freely given her consent. This record shows she would not have.

. The government also said at oral argument that by Ms. Austin and Mr. Spivey reporting the burglaries, they had "conscript[ed] the police to be their private collection agency” and "taken a calculated gamble.” To the extent the government implies it, I reject the idea that by reporting a crime a person welcomes the warrantless search of her home for other illegal activity.