[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-15023

_____

D.C. Docket No. 0:15-cr-60082-WPD-2

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

ERIC JERMAINE SPIVEY,
CHENEQUA AUSTIN,

Defendants - Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(June 28, 2017)

Before WILLIAM PRYOR, MARTIN, and BOGGS,[*] Circuit Judges.

WILLIAM PRYOR, Circuit Judge:

_____

[*] Honorable Danny J. Boggs, United States Circuit Judge for the Sixth Circuit, sitting by designation.

This appeal presents the question whether deception by law enforcement necessarily renders a suspect's consent to a search of a home involuntary. Chenequa Austin and Eric Spivey shared a home and a penchant for credit-card fraud. And they both became crime victims. Their home was twice burgled, which each time they reported to the police. Two officers, one posing as a crime-scene technician, came to their house on the pretense of following up on the burglaries, but mainly, unbeknownst to them, to investigate them for suspected fraud. The police had already caught the burglar who, in turn, had informed the police that Austin and Spivey's house contained evidence of credit-card fraud. Spivey hid some incriminating evidence in the oven before Austin invited the officers inside. The couple then provided the officers video footage of the burglary and led the officers through their home. After the officers saw a card-embossing machine, stacks of cards, and a lot of high-end merchandise in plain view, they informed Spivey that they investigated credit-card fraud. Spivey then consented to a full search that turned up a weapon, drugs, and additional evidence of fraud. Austin and Spivey moved to suppress all evidence obtained as a result of the officers' "ruse." The district court denied the motion to suppress because it found that Austin's consent to the initial search was voluntary and, alternatively, that Spivey's later consent cured any violation. Austin and Spivey each pleaded guilty to several

2

offenses, conditioned on the right to pursue this appeal of the denial of their motion to suppress. Because Austin made a strategic choice to report the burglary and to admit the officers into her home, the district court did not clearly err in finding that Austin's consent was voluntary. We affirm.

## I. BACKGROUND

Caleb Hunt twice burgled the Lauderhill, Florida, home of Chenequa Austin and Eric Spivey. Spivey reported the first burglary to the police. The second time, Hunt tripped a newly installed security system. Austin spoke with the police about the second burglary when officers responded to the audible alarm. When the police caught Hunt, he informed them that the residence was the site of substantial credit-card fraud. Indeed, Hunt told the police that the home "had so much high-end merchandise in it that he [burgled] it twice."

Two members of the South Florida Organized Fraud Task Force then became involved. Special Agent Jason Lanfersiek works for the United States Secret Service investigating financial crimes, including credit-card fraud. Detective Alex Iwaskewycz works for the Lauderhill Police Department. The Task Force decided to have Lanfersiek and Iwaskewycz investigate Austin and Spivey's suspected fraud.

3

The district court found that Lanfersiek and Iwaskewycz went to the residence "on the pretext of following up on two burglaries, which was a legitimate reason for being there, but not the main or real reason." Iwaskewycz displayed a gun and a badge. Lanfersiek wore a police jacket. Austin saw the agents approaching and went inside to warn Spivey and tell him to hide the card reader/writer in the oven. When the agents told Austin they were there to follow up on the burglary, Austin invited them in. The officers told Austin that Lanfersiek was a crime-scene technician for the police department, and Lanfersiek maintained the façade by pretending to brush for latent fingerprints. Austin led Lanfersiek and then Iwaskewycz through the house to the master bedroom, following the burglar's path. Spivey showed Iwaskewycz home-surveillance video of the burglary. A detective assigned to the burglary investigation later used that video evidence to help prosecute Hunt. Inside the home, both officers observed evidence of fraud, including a card-embossing machine, stacks of credit cards and gift cards, and large quantities of expensive merchandise such as designer shoes and iPads. Austin and Spivey separately told the officers that the embossing machine had been left in the apartment before they moved in. Iwaskewycz arrested Austin on an unrelated active warrant and removed her from the scene.

4

The officers then ended their ruse and told Spivey that they investigated credit-card fraud. Nevertheless, Spivey remained cooperative. After being advised of his rights, he signed two forms giving his consent to the officers to conduct a full search of the home and a search of his computer and cell phone. In that search, officers recovered high-end merchandise, drugs that field-tested positive as MDMA, a loaded handgun, an embossing machine, a card reader/writer (found inside the oven), and at least seventy-five counterfeit cards.

After a federal grand jury returned an indictment against them, Austin and Spivey moved to suppress all evidence procured as a result of the officers' "entry into Austin's residence . . . by fraud . . . which vitiated any consent." The district court denied the motion to suppress and rejected a "bright line rule that any deception or ruse vitiates the voluntariness of a consent-to-search." The district court explained, "Austin wanted to cooperate in solving the burglaries; expensive shoes had been stolen." The district court found that "Spivey thought he could talk his way out of a predicament and was willing to risk exposure to credit[-]card prosecution to get his property back. Thieves usually don't report that the property that they stole has been stolen." And "any problem with [Austin's] initial consent was cured by Spivey's later signing a written waiver of a search warrant." It determined that "the government has shown by clear and positive testimony that

5

the consents were voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion."

Both Austin and Spivey conditionally pleaded guilty. Austin pleaded guilty to conspiracy to commit access-device fraud and possess device making-equipment, 18 U.S.C. § 1029(b)(2), and aggravated identity theft, *id.* § 1028A(a)(1). Spivey pleaded guilty to conspiracy to commit access device fraud and possess device-making equipment, *id.* § 1029(b)(2), aggravated identity theft, *id.* § 1028A(a)(1), and being a felon in possession of a firearm, *id.* § 922(g)(1). Both pleas reserved the right to appeal the denial of the motion to suppress. The district court sentenced Austin to thirty-six months in prison and three years of supervised release and Spivey to seventy months in prison and three years of supervised release.

## III. STANDARD OF REVIEW

"A denial of a motion to suppress involves mixed questions of fact and law. We review factual findings for clear error, and view the evidence in the light most favorable to the prevailing party. We review *de novo* the application of the law to the facts." *United States v. Barber*, 777 F.3d 1303, 1304 (11th Cir. 2015) (citations omitted). Voluntariness is "a question of fact," *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973), that we may disturb only if clearly erroneous, *United States*

6

*v. Chemaly*, 741 F.2d 1346, 1352 (11th Cir. 1984). "Normally, we will accord the district judge a great deal of deference regarding a finding of voluntariness, and we will disturb the ruling only if we are left with the definite and firm conviction that the trial judge erred." *United States v. Fernandez*, 58 F.3d 593, 596–97 (11th Cir. 1995) (citation omitted). But we will review *de novo* the district court's application of the law about voluntariness to uncontested facts. *See United States v. Garcia*, 890 F.2d 355, 359–60 (11th Cir. 1989) (explaining that because "we believe[d] that the trial court['s]" "decision was based on the application of what he believed to be the existing law as applied to the uncontroverted facts," we "review[ed] the judge's finding of voluntariness *de novo*").

## IV. DISCUSSION

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause." U.S. Const. Amend. IV. A search is reasonable and does not require a warrant if law enforcement obtain voluntary consent. *Schneckloth*, 412 U.S. at 222. The parties agree that Austin consented to the search, so the sole question on appeal is whether her consent was voluntary.

7

"A consensual search is constitutional if it is voluntary; if it is the product of an 'essentially free and unconstrained choice.'" *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001) (quoting *Schneckloth*, 412 U.S. at 225). Voluntariness is "not susceptible to neat talismanic definitions; rather, the inquiry must be conducted on a case-by-case analysis" that is based on "the totality of the circumstances." *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989) (citing *Schneckloth*, 412 U.S. at 224–25). Relevant factors include the "voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found." *Chemaly*, 741 F.2d at 1352 (citation omitted).

Deceit can also be relevant to voluntariness. Because we require "that the consent was not a function of acquiescence to a claim of lawful authority," *Blake*, 888 F.2d at 798, deception invalidates consent when police claim authority they lack. For example, when an officer falsely professes to have a warrant, the consent to search is invalid because the officer "announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion." *Bumper v. North Carolina*, 391 U.S. 543, 550 (1968).

8

And when an officer lies about the existence of exigent circumstances, he also suggests that the occupant has no right to resist and may face immediate danger if he tries. *See, e.g.*, *United States v. Harrison*, 639 F.3d 1273 (10th Cir. 2011) (agents falsely implied that a bomb was planted in the apartment they sought to search). Deception is also likely problematic for consent if police make false promises. *See United States v. Watson*, 423 U.S. 411, 424 (1976) ("There were no promises made to him and no indication of more subtle forms of coercion that might flaw his judgment."); *cf. Alexander v. United States*, 390 F.2d 101, 110 (5th Cir. 1968) ("We do not hesitate to undo fraudulently induced contracts. Are the disabilities here less maleficent?").

In the tax context, we have ruled that when a taxpayer asked whether a "special agent" was involved in the investigation and the Internal Revenue Service answered "no," consent was involuntary because it was induced by an official misrepresentation that suggested the investigation was only civil, not criminal. *United States v. Tweel*, 550 F.2d 297, 299 (5th Cir. 1977). Contrary to the dissent's assertion that "consent searches are almost always unreasonable" when induced by deceit, Dissenting Op. at 26 (citing *Tweel*, 550 F.2d at 299), we have never applied this decision outside the administrative context, let alone to a situation in which the suspect is aware of the criminal nature of the investigation. This limitation makes

9

sense in the light of the rule that police officers are permitted to obtain a confession through deception under the Fifth Amendment. *See Illinois v. Perkins*, 496 U.S. 292, 297 (1990) ("Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns."); *see also United States v. Peters*, 153 F.3d 445, 463 (7th Cir. 1998) (Easterbrook, J., concurring) ("If a misunderstanding of one's status as a target—misunderstanding abetted by calculated silence and half-truths from agents and prosecutors—does not invariably make a statement involuntary, why should it make a disclosure of physical evidence involuntary?").

The Fourth Amendment allows some police deception so long the suspect's "will was [not] overborne," *Schneckloth*, 412 U.S. at 226. Not all deception prevents an individual from making an "essentially free and unconstrained choice," *id.* at 225. For example, undercover operations do not invalidate consent. *Lewis v. United States*, 385 U.S. 206, 206–07 (1966). When an undercover agent asks to enter a home to buy drugs, the consent is voluntary despite the agent's misrepresentations about his identity and motivation. *Id.* "If dissimulation so successful that the suspect does not know that he is talking to an agent is compatible with voluntariness, how could there be a rule that misdirection by a known agent always spoils consent?" *Peters*, 153 F.3d at 464 (Easterbrook, J.,

10

concurring). Although we distinguish undercover investigations from those where

the officer is "seeking . . . cooperation based on his status as a government agent,"

*United States v. Centennial Builders, Inc.*, 747 F.2d 678, 682 (11th Cir. 1984), an

individual who interacts with officers undertakes a knowing risk that the officers

may discover evidence of criminal behavior. *Cf. United States v. Wuagneux*, 683

F.2d 1343, 1348 (11th Cir. 1982) ("[A]ll taxpayers, especially businessmen, are

presumed to be aware of th[e] possibility" "that a routine civil audit may lead to

criminal proceedings if discrepancies are uncovered."). That "fraud, deceit or

trickery in obtaining access to incriminating evidence *can* make an otherwise

lawful search unreasonable," *United States v. Prudden*, 424 F.2d 1021, 1032 (5th

Cir. 1970) (emphasis added), does not mean that it *must*. Particularly because

physical coercion by police is only one factor to be considered in the totality of the

circumstances, *see Chemaly*, 741 F.2d at 1352, we should approach psychological

coercion the same way. The district court correctly stated the law when it

explained that deception does not always invalidate consent.

Austin and Spivey argue that the officers' deception was egregious because

the purpose of the ruse was to mislead them into believing that the officers were

there to "*assist* them," not to "*bust* them." They argue that a "ruse" about whether

11

Austin was the target of the investigation is worse than misrepresentations about whether an investigation is civil or criminal. We disagree.

We cannot say that it was clear error for the district court to find that, although the burglary investigation was "not the main or real reason" for the search, it was "a legitimate reason for being there." Iwaskewycz testified that it was a "dual-purpose investigation." And the district court found that "the videotape was eventually used in the burglary investigations." Austin argues that the stated purpose "was nothing more than a 'pretext'" because one agent had the "exclusive purpose" and the other had the "primary purpose" "to investigate the report of a credit-card plant," but even this argument concedes that at least one of the officers had a dual purpose. What matters is the existence of a legitimate reason to be there, not the priority that the officers gave that reason.

The subjective motivation of the officers is irrelevant. Consent is about what the suspect knows and does, not what the police intend. "Coercion is determined from the perspective of the suspect." *Illinois v. Perkins*, 496 U.S. 292, 296 (1990). Whether officers "deliberately lied" "does not matter" because the "only relevant state of mind" for voluntariness "is that of [the suspect] himself." *United States v. Farley*, 607 F.3d 1294, 1330 (11th Cir. 2010). And officers are entitled to be silent about their motivations. *See Prudden*, 424 F.2d at 1033 ("[T]he agents did not have

12

to warn him directly that they were undertaking a criminal investigation."). The officers' subjective purpose in undertaking their investigation does not affect the voluntariness of Austin's consent. *See Farley*, 607 F.3d at 1330–01.

Pretext does not invalidate a search that is objectively reasonable. *Cf. Whren v. United States*, 517 U.S. 806, 814 (1996) ("[T]he Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent."); *Heien v. North Carolina*, 135 S. Ct. 530, 539 (2014) ("We do not examine the subjective understanding of the particular officer involved."). As long as the officers are engaging in "objectively justifiable behavior under the Fourth Amendment," *Whren*, 517 U.S. at 812, their subjective intentions will not undermine their authority to stop or search, or in this appeal, to ask for consent to search. Responding to a burglary report is objectively justifiable behavior, and we must ask only whether the officers prevented Austin from making a free and unconstrained choice.

Stripped of its subjective purposes, the officers' "ruse" was a relatively minor deception that created little, if any, coercion. The officers admittedly misrepresented Agent Lanfersiek's identity, but there is no evidence that his exact position within the hierarchy of criminal law enforcement was material to Austin's consent. *Wuagneux* held that even though the agent did not reveal that he was a

13

part of a strike force, the suspect's knowledge that the agent worked for the Internal Revenue Service and was empowered to conduct a tax audit was sufficient for consent. 683 F.2d at 1347–48. Austin likewise knew that Agent Lanfersiek was involved in criminal investigations and was going to search her home. Austin understood that she faced a risk that Lanfersiek would notice evidence of the credit-card fraud when she consented to his presence in her home. His identity is material only to the subjective purpose of the investigation. The dissent argues that Agent Lanfersiek misrepresented his legal authority because the Secret Service does not have the authority to enforce a state burglary offense, Dissenting Op. at 28–29, but that misrepresentation did not lead Austin to believe that Lanfersiek could investigate without her consent or that Lanfersiek would not act upon evidence of criminal activity. And Lanfersiek acted within the scope of his authority to investigate credit-card fraud and was accompanied by an officer with the authority to investigate both burglaries and fraud. Pretending to be a crime-scene technician and to dust for fingerprints was perhaps silly and unnecessary, but it was relatively insignificant.

After it considered the totality of the circumstances, the district court correctly determined that Austin's consent was voluntary. The factors other than deceit all point in favor of voluntariness. Austin was not handcuffed or under arrest

14

when she gave her consent. *See Garcia*, 890 F.2d at 360–62. She invited the officers inside the home and volunteered video footage of the burglary. The encounter was polite and cooperative, and the officers used no signs of force, physical coercion, or threats. *See United States v. Espinosa-Orlando*, 704 F.2d 507, 513 (11th Cir. 1983). The officers did not inform Austin that she had the right to refuse consent, but they were not required to do so. *Schneckloth*, 412 U.S. at 248–49. And a warning is even less relevant in this context because it is easier to refuse consent when the police are offering to help than when they initiate an adversarial relationship. The district court found that the consent was "intelligently given." And "significantly," *Chemaly*, 741 F.2d at 1352 (citation omitted), Austin believed that no incriminating evidence would be found—or at least, nothing she and Spivey had not prepared to explain away.

The "ruse" did not prevent Austin from making a voluntary decision. Austin and Spivey informed the police of the burglaries and invited their interaction. The officers did not invent a false report of a burglary, nor claim any authority that they lacked. Agent Iwaskewycz testified that he and Lanfersiek never promised Austin that "[w]e're just here to investigate a burglary; anything else we see, we're gonna ignore." Austin knew that she was interacting with criminal investigators who had the authority to act upon evidence of illegal behavior. There is no evidence that

15

Austin felt that she was required to help with the burglary investigation or that she needed to consent to avoid her inevitable prosecution. From Austin's perspective, her ability to consent to the search of an area where she knew there was evidence of illegal activity was not dependent on whether the officers provided no explanation or a partial explanation of their intentions. "[M]otivated solely by the desire" to retrieve her stolen property, Austin consented to the officers' entry and search "at h[er] own peril." *Cf. Perkins*, 496 U.S. at 298.

And perhaps most significant of all, Austin and Spivey engaged in intentional, strategic behavior, which strongly suggests voluntariness. Although Austin and Spivey were victims of one crime and suspects of another, the district court reasoned, "[t]hieves usually don't report that the property that they stole has been stolen." The district court found that Austin and Spivey enlisted the officers' assistance to recover their property. Austin "wanted to cooperate" because "expensive shoes had been stolen," and Spivey was "willing to risk exposure to credit[-]card prosecution to get his property back." Before allowing the officers into their home, they hid the most damning piece of evidence in the oven. And Austin and Spivey gave a rehearsed story to explain the device that remained visible. This prior planning proves that Austin and Spivey understood that asking for the officers' assistance came with the risk that their own crimes would be

16

discovered. Austin's behavior does not evoke fear or good-faith reliance, but instead suggests that she sought to gain the benefit of police assistance without suffering potential costs. The more Austin behaved strategically, the more her behavior looked like a voluntary, rational gamble, and less like an unwitting, trusting beguilement. Although the plan to involve police to recover their stolen goods may not have been the best one, voluntariness does not require that criminals have perfect knowledge of every fact that might change their strategic calculus. Nor does it require that "consent [be] in the[ir] best interest." *United States v. Berry*, 636 F.2d 1075, 1081 (5th Cir. Unit B 1981).

When we view the evidence in the light most favorable to the judgment, Austin's consent was not "granted only in submission to a claim of lawful authority." *Schneckloth*, 412 U.S. at 233 (citations omitted). We agree with the district court that under the totality of the circumstances, "the government has shown by clear and positive testimony that the consents were voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion."

Austin and Spivey make two additional arguments based on precedent, both of which fail. First, they rely on the statement that "[i]ntimidation and deceit are not the norms of voluntarism. In order for the response to be free, the stimulus

17

must be devoid of mendacity." *Alexander*, 390 F.2d at 110. But this statement is dicta and arose in a materially different context. In *Alexander*, postal inspectors illegally detained an employee suspected of mail theft. They then admittedly "misle[d]" the defendant by telling him they were investigating mail theft, particularly jewelry, when what they really sought were marked dollar bills they had placed in his mail. *Id.* at 102–03, 110. We held that compliance with "disingenuous questioning" by the police did not "purg[e] the taint of the illegal arrest." *Id.* at 110. Austin's consent, in contrast, did not have to overcome any previous taint. Second, Austin and Spivey rely on a decision that expressed concern with "allow[ing] the state to secure by stratagem what the fourth amendment requires a warrant to produce." *Graves v. Beto*, 424 F.2d 524, 525 (5th Cir. 1970). But this decision involved the scope of consent, not the voluntariness of consent. *See id.* at 525 n.2. In *Graves*, the police requested a blood sample and the suspect refused. *Id.* at 525. The suspect consented only after the police said the sample would be used to determine his alcohol content, but the police nevertheless ran a test to compare his blood type with blood sample from the scene of a rape. Writing for our predecessor Court, Judge Wisdom interpreted the consent as limited to the blood-alcohol test because individuals can place boundaries on their consent. *Id.*

18

Even if Austin and Spivey had framed their appeal as a question of the scope of consent, Judge Wisdom's approach in *Graves* cuts in favor of the government. To the extent the officers lied, we would not "void the consent as to the purpose for which it was given," but instead "simply limit the state to the purposes represented." *Id.* at 525 n.2. We could attempt to limit Austin's consent to the burglary investigation, but unlike in *Graves*, the two police purposes do not align with divisible searches. If the scope of consent is about physical space, investigating the burglary and the credit-card fraud both involve looking in the living room and master bedroom.  Austin gave "unequivocal" and "specific" consent to the physical presence of police in those spaces. The agents did not enter additional parts of the home irrelevant to the burglary, secretly film, or run any fraud-specific tests. *Cf. Gouled v. United States*, 255 U.S. 298, 309 (1921) (holding it unconstitutional to secretly ransack an office and seize papers when allowed into the home on the false representation that the officer was there for a social visit). The incriminating evidence was in plain view.

If the scope of Austin's consent were limited by police intent, then the officers had two legitimate purposes for the search. Judge Wisdom distinguished evidence acquired "in good faith for a legitimate purpose," *Graves*, 424 F.2d at 525 n.1, as evidence that could be used for another purpose. And if the police had

19

come to the home with the sole purpose of investigating the burglary, the district court found that "it is highly likely that he would have seen most of the same incriminating evidence in plain view." After all, even Hunt, the burglar, was suspicious.

Not all deception by law enforcement invalidates voluntary consent. Austin and Spivey deride the "shocking" nature of the "misconduct" in this case, but we are "not empowered to forbid law enforcement practices simply because [we] consider[] them distasteful." *Florida v. Bostick*, 501 U.S. 429, 439 (1991). The district court did not clearly err in determining that the "ruse" did not coerce Austin into giving her consent involuntarily.

Because the initial search was supported by Austin's voluntary consent, it did not violate the Fourth Amendment. And because the initial search was constitutional, we do not reach any question about Spivey's later consent and the fruit of the poisonous tree. We affirm the denial of the motion to suppress.

## V. CONCLUSION

We **AFFIRM** the judgments of conviction and the sentences of Austin and Spivey.

20

MARTIN, Circuit Judge, dissenting:

The Majority describes this case as raising the question of whether "deception by law enforcement" during the search of a home violates the Fourth Amendment of the United States Constitution. Among other things, the Fourth Amendment protects the "right of the people to be secure in their [] houses," and requires that warrants allowing a home to be searched, issue "upon probable cause, supported by Oath or affirmation." The two officers here had no warrant allowing their entry into the home of Eric Spivey and Chenequa Austin. Instead, they had a plan to get around the Fourth Amendment's protections. They lied about their legal authority. They lied about their real reason for being there. And they took advantage of a public trust in law enforcement in order to search the Spivey/Austin home without a warrant. When Ms. Austin learned the true purpose of the officers' presence in her home, she stopped cooperating immediately. Based on all the circumstances of her case, it is clear to me that Ms. Austin's permission for the officers to enter her home was not voluntarily given.

This litigation could have easily been avoided. Instead of planning their ruse, the officers could have gotten a warrant. We know that "[w]ith few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." Kyllo v. United States, 533 U.S. 27,

21

31, 121 S. Ct. 2036, 2042 (2001) (Scalia, J.). There is no exception that fits this case. I am concerned that the Majority opinion blesses the deliberate circumvention of constitutional protections, and in this way undermines the public trust in police. I therefore dissent.

## I. BACKGROUND

There is no dispute about the facts here. The two officers who conducted the search, Special Agent Lanfersiek and Detective Iwaskewycz, both testified at a suppression hearing, and told us what happened. I will add some detail taken from their testimony, which is necessary to fully understand why this search was not lawful.

The Majority opinion misses the fact that Agent Lanfersiek and Detective Iwaskewycz deliberately planned how to circumvent the Fourth Amendment's general requirement that they get a warrant before searching someone's home. Agent Lanfersiek testified that instead of getting a warrant, he and about ten other officers held a planning session during which they "made a decision to come up with the methodology of employing the ruse." They decided to pretend to investigate burglaries that had already been solved, as a way to get consent to enter the home and search for evidence of credit-card fraud. To avoid suspicion, they also came up with the idea of Agent Lanfersiek dressing up as a crime-scene

22

technician.  Agent Lanfersiek is a Special Agent of the U.S. Secret Service, and in that job had no authority to investigate a local burglary.  Neither, apparently, did he know how to dust for fingerprints.  Nevertheless, this ploy, together with the costume he wore, gave him cover.  Wearing his costume, he went through the Spivey/Austin home pretending to dust for fingerprints, asking for and receiving permission from Ms. Austin to go into areas of the home she likely would not have otherwise let him see.  The officers hoped they would be able to see evidence of credit-card fraud in plain view.  And if they did, they planned on using the evidence they had seen to get consent to search the rest of the home.  In the event this plan did not work, the officers had an assistant state attorney on standby ready to get a search warrant.

There is also more to the order of events here than the Majority opinion includes.  The officers testified that when they arrived at Ms. Austin's home, she was "genuinely excited," "relieved," and "happy" they were there to follow-up on the reported burglaries of her home.  Agent Lanfersiek asked Ms. Austin to show him where the burglar entered the house so he could dust for fingerprints.  She did.  After pretending to dust the door, he asked Ms. Austin where else the burglar had gone.  She said the bedroom, and Agent Lanfersiek asked to go there.  Ms. Austin took him into the bedroom, where Agent Lanfersiek asked if she would open the

drawers to the bedside tables.  Again, Ms. Austin complied.  Agent Lanfersiek asked where else the burglar had gone.  Ms. Austin replied the bathroom and closet areas, so he went to see those as well.

Agent Lanfersiek saw evidence of credit-card fraud in plain view in these different areas.  He and Det. Iwaskewycz then decided to separate Mr. Spivey and Ms. Austin and talk to them individually.  This is where the ruse ended.  Det. Iwaskewycz went outside with Ms. Austin and explained to her that he was really there to investigate credit-card fraud.  He asked about the evidence in the bedroom.  Ms. Austin gave some unconvincing answers.  As a result, Det. Iwaskewycz decided Ms. Austin was not likely to cooperate and provide the consent to the full search he and Agent Lanfersiek wanted.  So he called a colleague to run a check on Ms. Austin.  He discovered there was an unrelated outstanding warrant for Ms. Austin's arrest.  Ms. Austin was promptly arrested.

## II.  STANDARD OF REVIEW

Although voluntariness is usually a question of fact, the parties do not dispute the facts and both rely solely on the testimony of the government's witnesses.  In a case like this, our review is de novo.  United States v. Valdez, 931 F.2d 1448, 1451–52 (11th Cir. 1991); United States v. Garcia, 890 F.2d 355, 359–60 (11th Cir. 1989).

24

### III.  DISCUSSION

The Fourth Amendment generally prohibits officers from searching a person's home without a warrant.  Payton v. New York, 445 U.S. 573, 586, 100 S. Ct. 1371, 1380 (1980) ("[S]earches and seizures inside a home without a warrant are presumptively unreasonable.").  One exception to the warrant requirement is where the person voluntarily gives consent for the officers to search.  Illinois v. Rodriguez, 497 U.S. 177, 181, 110 S. Ct. 2793, 2797 (1990).  The question before us here is whether Ms. Austin's consent for the officers to search her home was voluntary.

### A.  VOLUNTARINESS PRECEDENT

Consent is voluntary "if it is the product of an 'essentially free and unconstrained choice.'"  United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001) (quoting Schneckloth, 412 U.S. at 225, 93 S. Ct. at 2047).  We evaluate whether a consensual search was voluntary by examining the "totality of the circumstances" in each case.  United States v. Yeary, 740 F.3d 569, 581 (11th Cir. 2014).  It is the government's burden to prove both that consent was given and that it was "given freely and voluntarily."  Id. (quotation omitted).

In analyzing the totality of the circumstances, there is no one factor that controls.  Schneckloth, 412 U.S. at 226, 93 S. Ct. at 2047.  Instead this Court

25

recognizes several important factors to consider "including the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found." Purcell, 236 F.3d at 1281.

This Court has also said that consent searches are almost always unreasonable when government agents induce consent by "deceit, trickery or misrepresentation." United States v. Tweel, 550 F.2d 297, 299 (5th Cir. 1977).[1] In Tweel, for example, the defendant was audited by the IRS. Id. at 298. The defendant wanted to know whether the IRS interest in him was related to a civil or a criminal case, so his accountant asked whether a special agent was involved. See id. The IRS truthfully replied that no special agent was involved, but purposefully did not say that the inquiry was being made on behalf of the Organized Crime and Racketeering Section of the Department of Justice. Id. Because of that deliberate omission, this Court said the "investigation was a sneaky deliberate deception" that rendered the defendant's consent involuntary. Id. at 299.[2]

---

[1] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981. Id. at 1209.

[2] The Majority says this Court has "never applied [Tweel] outside the administrative context, let alone to a situation in which the suspect is aware of the criminal nature of the

Eleventh Circuit precedent about consenting to a search emphasizes that the use of deception to get consent violates the Fourth Amendment because it is an "abuse" of the public's trust in law enforcement.  See id.; see also SEC v. ESM Gov't Sec., Inc., 645 F.2d 310, 316 (5th Cir. Unit B May 18, 1981).  For example, in ESM, this Court said:

> We believe that a private person has the right to expect that the government, when acting in its own name, will behave honorably.  When a government agent presents himself to a private individual, and seeks that individual's cooperation based on his status as a government agent, the individual should be able to rely on the agent's representations.  We think it clearly improper for a government agent to gain access to [evidence] which would otherwise be unavailable to him by invoking the private individual's trust in his government, only to betray that trust.  When that government agency then invokes the

investigation."  Maj. Op. at 9 (emphasis added).  But three of my colleagues on this Court did just that in a recent unpublished decision.  See United States v. Jaimez, 571 F. App'x 935, 937 (11th Cir. 2014) (per curiam) (unpublished) (citing Tweel for the proposition that "[w]e have found that consent 'induced by deceit, trickery, or misrepresentation' can render consent involuntary" in the context of a consent search of a defendant's home for contraband).

27

power of a court to gather the fruits of its deception, we hold that there is an abuse of process.

Id. Thus, Eleventh Circuit precedent requires us to consider whether the public trust was improperly employed by the officers.

## B. THE TOTALITY OF THE CIRCUMSTANCES

Considering the totality of the circumstances under the standards set by our precedent, Ms. Austin's consent was not voluntary. The officers used deceit, trickery, and misrepresentation to hide the true nature and purpose of their investigation as well as the authority they had to investigate the burglaries. This deception caused Ms. Austin to allow the officers into her home. And when the officers revealed the ruse to Ms. Austin, she immediately stopped cooperating.

First, the officers got consent from Ms. Austin to enter her home only through the deliberate misrepresentation of their authority. As the Majority rightly recognizes, "deception invalidates consent when police claim authority they lack." Maj. Op. at 8. Agent Lanfersiek testified that as a federal Secret Service agent, he was not at the Spivey/Austin home about a burglary. And the government conceded at oral argument that Agent Lanfersiek, as a federal agent, had no authority to investigate a local burglary. Knowing that his presence might alert Ms. Austin to the true purpose of his investigation, Agent Lanfersiek hid his real

28

identity.  He pretended to be a member of the Lauderhill Police Department and played the part of a crime-scene technician because that role was best suited to convince Ms. Austin to allow him into parts of her home she would otherwise have refused.  Agent Lanfersiek's misrepresentations allowed him to ask Ms. Austin—without raising suspicion—to show him around her home, let him into her bedroom, and even open drawers and look inside her closet.  In other words, Agent Lanfersiek lied about his law enforcement authority in order to gain warrantless access to the most private areas of Ms. Austin's home.  See Tweel, 550 F.2d at 299; see also ESM, 645 F.2d at 316 ("When a government agent presents himself to a private individual, and seeks that individual's cooperation based on his status as a government agent, the individual should be able to rely on the agent's representations.").  Had Ms. Austin known Agent Lanfersiek's true identity, this record shows she would not have let him into her home.[3]

Neither was Det. Iwaskewycz there to investigate the burglaries.  Although he was employed by the local police department, his duties did not include investigating burglaries.  Instead, he was assigned to the federally-funded South

---

[3] The Majority says that the burglaries were a legitimate reason for the officers to be at Ms. Austin's home.  Maj. Op. at 11–12.  But even setting aside the legal authority issues already discussed, the fact that other officers might have been able to investigate the burglaries through a warrantless consent search does not make the consent here voluntary.  See Kyllo, 533 U.S. at 35 n.2, 121 S. Ct. at 2043 n.2 ("The fact that equivalent information could sometimes be obtained by other means does not make lawful the use of means that violate the Fourth Amendment.").

Florida Organized Fraud Task Force. The task force paired Secret Service agents with local detectives to combat financial crimes in the Southern District of Florida. Det. Iwaskewycz had been assigned to this task force for several years. And he testified that although the case of the burglary of the Spivey/Austin home was still technically an open file, he knew the burglar had been caught and confessed to burglarizing the Spivey/Austin home. He also testified that the case had been officially closed by the neighboring police department that caught the burglar. Thus, even aside from the fact that Det. Iwaskewycz's job did not include investigating burglaries, he would not have been at the Spivey/Austin home for that reason anyway. The burglary was already solved. This record shows he lied about why he was at the home and about who Agent Lanfersiek was. See ESM, 645 F.2d at 316.

Second, the officers methodically planned their deception. Well in advance of the search, Agent Lanfersiek convened a team of about ten law enforcement officers to make a plan which would circumvent the Fourth Amendment's warrant requirement. This fact also supports the conclusion that Ms. Austin's consent was not voluntary. The Supreme Court has told us to be wary of police planning around constitutional protections. See Missouri v. Seibert, 542 U.S. 600, 617, 124 S. Ct. 2601, 2613 (2004) (holding that "[s]trategists dedicated to draining the

30

substance out of" constitutional protections cannot accomplish by planning around these protections because it "effectively threatens to thwart [their] purpose"). The Eleventh Circuit has also adhered to this principle. We have refused to "allow the state to secure by stratagem what the fourth amendment requires a warrant to produce." Graves v. Beto, 424 F.2d 524, 525 (5th Cir. 1970).

Third, and importantly, this record demonstrates that Ms. Austin refused to cooperate with law enforcement once the officers revealed their true purpose.[4] This shows she would not have allowed the officers into her home had they not lied about their authority and their reason for wanting to get into her house. Before the officers told her they were there to investigate credit-card fraud, they testified Ms. Austin was "genuinely excited," "relieved," and "happy" they were there to follow-up on the burglaries—crimes of which Ms. Austin was the victim. Once the officers' true purpose was revealed, her demeanor changed so much that Agent Lanfersiek had a colleague run a check for any outstanding arrest warrants. After

---

[4] The Majority says the pretext for investigating the burglary is not relevant. Maj. Op. at 13 (citing Whren v. United States, 517 U.S. 806, 814, 116 S. Ct. 1769, 1775 (1996)). But Whren was about inquiries into whether probable cause exists, which are made from a law enforcement officer's perspective. In contrast, when we decide whether Ms. Austin's consent was voluntary, we must consider Ms. Austin's subjective perspective. The Majority acknowledges this. See Maj. Op. at 12; Schneckloth, 412 U.S. at 229, 93 S. Ct. at 2049 (noting that "[t]he very object of the inquiry" in determining voluntariness is "the nature of a person's subjective understanding"). The pretext of investigating a burglary was not a "silent" motivation as the Majority says, but was instead the express reason given to Ms. Austin that led her to let the officers into her home. Maj. Op. at 12.

31

finding one, he arrested Ms. Austin and had her taken to the police station.  As this

Court has put it, deceit is not one of "the norms of voluntarism."  Alexander v.

United States, 390 F.2d 101, 110 (5th Cir. 1968).  "In order for the response to be

free, the stimulus must be devoid of mendacity."  Id.  Ms. Austin's response, then,

could not have been free, because it was entirely a product of the officers'

untruthfulness.[5]

Given these facts, I expected this panel to suppress the search of the

Spivey/Austin home.  It is true, as the Majority says, that not all police deception is

unconstitutional.[6]  Maj. Op. at 10–11.  But the police deception here is

unconstitutional because it meant that Ms. Austin's consent was not knowing and

voluntary.  My read of the Majority opinion is that it tries to distinguish the police

deception here from what this Court's precedent says is unconstitutional conduct,

mainly by relying on two cases: United States v. Wuagneux, 683 F.2d 1343 (11th

Cir. 1982), and United States v. Prudden, 424 F.2d 1021 (5th Cir. 1970).  Maj. Op.

---

[5] These circumstances show that, contrary to the Majority's assertion, Agent Lanfersiek's position was material to Ms. Austin's consent.  See Maj. Op. at 13–14.  His deception and misrepresentation was not just "perhaps silly," as the Majority describes it.  Id.  He lied about his true legal authority so that the ruse could succeed.

[6] The Majority provides undercover operations as an example.  Maj. Op. at 10–11.  This was not an undercover operation.  Indeed, we have specifically distinguished undercover operations from the type of deceit used here.  See United States v. Centennial Builders, Inc., 747 F.2d 678, 682–83 (11th Cir. 1984) (distinguishing undercover investigations from consent to search "obtained through deception").

32

at 11–14.  Although the Majority is again correct that voluntary consent can carry with it the risk that officers may discover evidence of criminal behavior, see Wuagneux, 683 F.2d at 1348, we are still required to look to whether the initial consent was voluntary.  In Wuagneux, for example, the defendant knew he was being investigated by the IRS.  See id.  The officers here, by contrast, told Ms. Austin they were there to help her.  As a victim of crime, her acceptance of the officers' offer of help made sense.  But in fact, the officers relied on Ms. Austin's trust to manipulate her, and gave no indication that she was actually the one being investigated.  See Tweel, 550 F.2d at 299 ("[T]he agent's failure to apprise the [defendant] of the . . . nature of this investigation was a sneaky deliberate deception . . . ."); ESM, 645 F.2d at 316 ("We think it clearly improper for a government agent to gain access to [evidence] which would otherwise be unavailable to him by invoking the private individual's trust in his government, only to betray that trust.").[7]

---

[7] The Majority says that a warning of the right to refuse consent is less relevant in this context "because it is easier to refuse consent when the police are offering to help than when [the police] initiate an adversarial relationship."  Maj. Op. at 15.  The Majority cites no legal authority for this proposition, and in any event, the government had the burden of proving the opposite in this case—that had Ms. Austin been aware of the adversarial nature of the investigation she would still have freely given her consent.  This record shows she would not have.

33

The Majority also points to Prudden to say that not all deception makes a search unreasonable. Maj. Op. at 11. But Prudden only shows how far the officers in this case went beyond the line of what's constitutional. In Prudden, the government agent "in no way concealed his true identity." 424 F.2d at 1032. We simply have a different case here.

## IV.  CONCLUSION

"It is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." Welch v. Wisconsin, 466 U.S. 740, 748, 104 S. Ct. 2091, 2097 (1984) (quotation omitted). That is why we presume warrantless searches of the home are unreasonable. Kentucky v. King, 563 U.S. 452, 459, 131 S. Ct. 1849, 1856 ("It is a basic principle of Fourth Amendment law, we have often said, that searches and seizures inside a home without a warrant are presumptively unreasonable." (quotation omitted)). This is also why the Supreme Court has long incentivized law enforcement to get a warrant, rather than resort to warrantless entries. See, e.g., Ornelas v. United States, 517 U.S. 690, 699, 116 S. Ct. 1657, 1663 (1996).

At oral argument, the government was asked why it did not simply get a warrant, rather than using the ruse to get into the house. The government did not

34

say it lacked probable cause.[8]  Neither did it say it would have been too burdensome.  Indeed, this record reflects that the officers had an assistant state attorney on standby in case their ruse did not succeed.  What the government said was that there was "no requirement" to get a warrant.

The Majority opinion tells police that what happened here is not a problem. In effect, it teaches police they don't need to get a warrant so long as they can pre-plan a convincing enough ruse.  This is true even if, as here, that ruse includes skirting the limits of the officer's legal authority to investigate only certain crimes. In doing so, I fear the Majority opinion undermines the public's trust in the police as an institution together with the central protections of the Fourth Amendment. When I read the record in Ms. Austin's case, I don't believe this is the "reasonable" conduct our Founders had in mind when drafting the Fourth Amendment.  I therefore dissent.

---

[8] The government also said at oral argument that by Ms. Austin and Mr. Spivey reporting the burglaries, they had "conscript[ed] the police to be their private collection agency" and "taken a calculated gamble."  To the extent the government implies it, I reject the idea that by reporting a crime a person welcomes the warrantless search of her home for other illegal activity.

35